[Cite as *Fagan v. Boggs*, 2011-Ohio-5884.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

LINDA FAGAN, et al.,                    :
                                         :
        Plaintiffs-Appellees,            :        Case No. 10CA17
                                         :
        vs.                              :        **RELEASED: 10/21/2011**
                                         :
ROBERT J. BOGGS, DIRECTOR        :        DECISION AND
OHIO DEPARTMENT of              :        JUDGMENT ENTRY
AGRICULTURE,                             :
                                         :
        Defendant-Appellant.             :
_____

APPEARANCES:

Mike DeWine, Ohio Attorney General, and James R. Patterson, Ohio
Assistant Attorney General, Reynoldsburg, Ohio, for the Appellant.

David G. Cox, Columbus, Ohio, for the Appellees.
_____

McFarland, J.:

        **{¶1}** Appellant, Robert J. Boggs, Director, Ohio Department of

Agriculture, appeals the decision of the Washington County Court of

Common Pleas, which issued a declaratory judgment and injunction in favor

of Appellees, Linda Fagan and Donna Betts, with regard to a stop

sale/withdrawal from distribution order issued in connection with Appellees'

manufacture and distribution of pet food.  Appellant also appeals the trial

court's award of attorneys fees to Appellees.  On appeal, Appellant contends

that the trial court 1) erred and abused its discretion in holding that Appellant denied Appellees due process and the equal protection of the laws in applying R.C. 923.52; 2) erred and abused its discretion in awarding Appellees attorney fees; 3) erred and abused its discretion in issuing an injunction against future enforcement by Appellant of Ohio's feed label laws against Appellees' feed product labels; and 4) erred and abused its discretion in holding that Appellant engaged in illegal rulemaking.

{¶2} Based upon our conclusion that Appellees did not avail themselves of the administrative process available to them in the form of a condemnation hearing, we conclude that the trial court erred in finding Appellant's issuance of a stop sale order resulted in a deprivation of due process. Additionally, as Appellees have not demonstrated that they were a member of a suspect class, that they were subjected to an arbitrary exercise of power, or that they were treated differently than other persons under like circumstances, we conclude that the trial court erred in finding an equal protection violation. As such, Appellant's first assignment of error is sustained. Based upon our conclusion that the trial court abused its discretion in awarding attorney fees to Appellees, Appellant's second assignment of error is sustained and the issue of attorney fees is remanded for further proceedings consistent with this opinion.

{¶3} Further, based upon our conclusion that the trial court erred in granting injunctive relief beyond what was reasonable and necessary, Appellant's third assignment of error is sustained, in part. Specifically, we uphold the injunction, but only to the limited extent that it enjoins Appellant from issuing stop sale orders or revoking Appellees feed registrations based upon the inclusion of raw milk as an ingredient. Finally, in light of our conclusion that Appellant engaged in illegal rulemaking in violation of R.C. Chapter 119 when it implemented a de facto rule prohibiting the use of milk, or raw milk, as an ingredient in pet food, Appellant's fourth assignment of error is overruled.

FACTS

{¶4} Appellees, Linda Fagan and Donna Betts, are manufacturers of pet food, the primary ingredient of which is milk, or raw milk, and have been in this business since 2001 and 2002, respectively. Appellees were previously issued commercial feed registrations by the Ohio Department of Agriculture, "ODA," and sold their products at local farmers markets. On February 14, 2006, Appellees were issued "Stop Sale/Withdraw from Distribution" orders from the Ohio Department of Agriculture, pursuant to R.C. 923.52. The basis for the orders, according to the language contained in the orders themselves, was that Appellees were "[s]elling pet food

products made from milk. Milk is not recognized as a feed ingredient under the definition of AAFCO (Association of American Feed Control Officials)." Appellees complied with the orders. Having no feed on hand at the time the orders were issued[1], Appellees ceased further production of their pet food.

{¶5} Subsequently, by letters dated April 24, 2006, the ODA notified Appellees of their intent to revoke Appellees' commercial feed registrations pursuant to R.C. 923.42. In the letters, the ODA also notified Appellees of their right to administrative hearings under R.C. 119. Both Appellees obtained counsel in order to prepare for their requested hearings, which were scheduled on July 12, 2006. However, having apparently determined that Appellees were no longer marketing their commercial feed, the ODA withrew its proposed revocations and the scheduled hearings were cancelled. At that point, the situation essentially came to a standstill, with Appellees having never commenced their production and the ODA having never pursued the revocation of Appellees' commercial feed registrations.

{¶6} On July 31, 2006, Appellees filed a complaint for declaratory judgment and injunctive and other relief against the ODA. Then on September 24, 2007, Appellees filed an amended complaint. In their

---

[1] This is true, with the exception of Appellee Fagan, who did have butter on hand. Upon issuance of the order, the butter was released to Appellee Fagan for her own personal use.

amended complaint, Appellees alleged that 1) R.C. 923.52 is unconstitutional on its face and as applied to them; 2) neither the director of the ODA nor his staff can withdraw a proposed action under R.C. 119 once an adjudication hearing is requested; 3) that a person who requests an adjudication hearing once an agency issues a proposed action becomes a prevailing party if the agency chooses to withdraw the proposed action prior to the hearing; and 4) ODA engaged in illegal rulemaking. Further, as part of their prayer for relief, Appellees specifically requested that the court declare them to be "prevailing parties" under R.C. 119.092 and award them attorney's fees and costs pursuant to that statute, as well as R.C. 2335.39 and 2721.11.[2] The ODA responded by filing an amended answer on October 9, 2007, and the matter proceeded with discovery.

{¶7} ODA filed a motion for summary judgment on November 16, 2007. In support of their motion for summary judgment, Appellant attached an affidavit by David Simmons, averring that in addition to containing the prohibited ingredient of milk, Appellees' labels also failed to contain a guaranteed analysis,[3] disclosures of minimum and maximum percentages of crude protein, crude fat, crude fiber and moisture, intended animal species for the pet foods, or statement of nutritional adequacy and purpose of the

---

[2] R.C. 2721.11 provides that a court may award court costs in any action or proceeding in which declaratory relief is sought.
[3] Appellees' labels provide for a "laboratory analysis" rather than a "guaranteed analysis."

product.  Although Appellees opposed the motion for summary judgment, they did not address Appellant's claims regarding the additional deficiencies in their product labels.  The trial court ultimately denied the motion for summary judgment, without addressing the additional alleged labeling deficiencies.

{¶8} The matter proceeded to a trial on the merits to the court on August 25, 2008.  After hearing the evidence presented by both parties, the trial court ordered closing arguments, as well as findings of fact and conclusions of law to be submitted by the parties.   The trial court then adopted, almost verbatim, Appellees proposed findings of fact and conclusions of law, and issued its order and decision on October 29, 2008.

{¶9} In its order and decision, the trial court found that R.C. 923.52 was constitutional on its face, but was unconstitutional as applied by the ODA to Appellees.  As a result, the trial court found Appellees' complaint for injunctive relief to be well taken and vacated the ODA's stop orders.  The trial court further found that Appellees' pet food labels complied with ODA regulations and that because Appellees had not been afforded a hearing on the validity of their labels, the court deemed the labels to be in compliance with Ohio law and enjoined the ODA from further action to prohibit Appellees' use of their commercial feed licenses for the manufacture of pet

food, on the basis that their labels did not comply with Ohio law. Further, the trial court determined Appellees to be "prevailing parties" under Ohio law and ordered that Appellee Fagan recover attorney fees in the amount of $9,647.46, and Appellee Betts recover attorney fees in the amount of $9,773.43.

{¶10} Additionally, the trial court reserved the right to impose additional fees upon the application of Appellees for fees and costs incurred during the hearing and the post-hearing period. The trial court further granted Appellees' motion to voluntarily dismiss counts two and three of their amended complaint. The trial court's order and decision did not contain language indicating that it was a final, appealable order.

{¶11} Subsequently, and as essentially invited to do by the trial court's order, Appellees filed a post-trial motion for attorney's fees and costs on November 4, 2008. In their motion, Appellees requested additional fees be awarded to them for the period from June of 2008 to the date the motion was filed. Appellant, ODA, filed a memorandum contra to the motion on November 18, 2008, to which Appellees filed a reply on November 19, 2008. All of these pleadings remained pending at the time ODA filed its first appeal in this matter on November 26, 2008. As such, this Court dismissed the prior appeal for lack of a final, appealable order.

{¶12} After the dismissal, on May 25, 2010, the trial court held a hearing on the issue of attorney fees and ultimately awarded Appellee Fagan an additional $3,576.25 in fees and costs, and awarded Appellee Betts an additional $3,559.75 in fees and costs. It is from this decision and entry that Appellant now brings its timely appeal, assigning the following errors for our review.

## ASSIGNMENTS OF ERROR

"I.    THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN HOLDING THAT APPELLANT DENIED APPELLEES DUE PROCESS AND THE EQUAL PROTECTION OF THE LAWS IN APPLYING R.C. 923.52.

II.    THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN AWARDING APPELLEES ATTORNEY FEES.

III.   THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN ISSUING AN INJUNCTION AGAINST FUTURE ENFORCEMENT BY APPELLANT OF OHIO'S FEED LABEL LAWS AGAINST APPELLEES' FEED PRODUCT LABELS.

IV.    THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN HOLDING THAT APPELLANT ENGAGED IN ILLEGAL RULE MAKING."

## STANDARD OF REVIEW

{¶13} Both parties agree that our standard of review on appeal is abuse of discretion. In doing so, however, Appellant relies on cases involving appeals from administrative hearings. The procedural history of this case indicates that there was no administrative hearing held, and that

instead the case originated with the filing of a complaint for declaratory judgment at the common pleas court level. After a trial to the bench on the merits, Appellant now appeals to this Court for a review of the trial court's decision.

{¶14} A declaratory judgment is a civil action and provides a remedy in addition to other legal and equitable remedies available. *Aust v. Ohio State Dental Bd.* (2000), 136 Ohio App.3d 677, 681, 737 N.E.2d 605; see, also, *In re Arnott*, -- Ohio App.3d --, 2010-Ohio-5392, 942 N.E.2d 1124 at ¶ 17. In *Arnott*, this Court further noted as follows:

"In *Mid-American Fire & Cas. Co. v. Heasley*, 113 Ohio St.3d 133, 2007-Ohio-1248, 863 N.E.2d 142, the Supreme Court of Ohio reaffirmed that [t]he granting or denying of declaratory relief is a matter for judicial discretion, and where a court determines that a controversy is so contingent that declaratory relief does not lie, this court will not reverse unless the lower courts determination is clearly unreasonable. Id. at ¶ 12, quoting *Bilyeu v. Motorists Mut. Ins. Co.* (1973), 36 Ohio St.2d 35, 65 O.O.2d 179, 303 N.E.2d 871, at syllabus. See also *Englefield v. Corcoran*, Ross App. No. 06CA2906, 2007-Ohio-1807, 2007 WL 1162162, at ¶ 11. Accordingly, we will not reverse the trial court's decision to render declaratory relief unless the trial court abused its discretion. 'Abuse of discretion' connotes more than an error of judgment; it implies that the court's action was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140." *Arnott* at ¶ 19.

However, as further noted in *Arnott*, "[a] trial court's determination of purely legal issues is never one of degree or discretion. Regardless of whether the action is styled as one for declaratory relief, the trial court must correctly apply the law." *Arnott* at ¶ 42; see, also, *Washington County Home v. Ohio*

*Dept. of Health*, 178 Ohio App.3d 78, 2008-Ohio-4342, 896 N.E.2d 1011 at

¶ 27 ("we conduct a de novo review of a trial court's judgment interpreting a

statute and afford no deference to the trial court's interpretation of a

statute.").   Thus, we review the trial court's determinations on questions of

law de novo.

{¶15} For ease of analysis, we address Appellant's assignments out of

order.

ASSIGNMENT OF ERROR I

{¶16} In its first assignment of error, Appellant contends that the trial

court erred and abused its discretion in holding that Appellant denied

Appellees due process and the equal protection of the laws in applying R.C.

923.52.  A review of the record reveals that the trial court determined that

R.C. 923.52 was constitutional on its face but unconstitutional as applied to

Appellees.

{¶17} R.C. 923.52 is entitled "Withdrawal from distribution orders"

and provides as follows:

"The director of agriculture may issue and enforce a written withdrawal
from distribution order to the manufacturer or distributor of any lot of
commercial feed requiring it to be held at a designated place when the
director has reasonable cause to believe that the commercial feed is offered
or exposed for distribution or distributed in violation of any of the provisions
of sections 923.41 to 923.55 of the Revised Code or any rule adopted under
those sections. The commercial feed shall be held until a release in writing is
issued by the director. A release shall not be issued until sections 923.41 to

923.55 of the Revised Code and the rules adopted under those sections are complied with and until all costs and expenses incurred in connection with the violation have been paid by the manufacturer or distributor. *If compliance is not obtained within thirty days of receipt of the withdrawal from distribution order, the director may begin, and shall begin upon request by the manufacturer or distributor, proceedings for condemnation under section 923.53 of the Revised Code.*"  (Emphasis added).

{¶18} R.C. 923.53 is entitled "Seizure and condemnation of feed" and

provides as follows:

"Any lot of commercial feed not in compliance with sections 923.41 to 923.55 of the Revised Code or any rule adopted under those sections is subject to seizure on complaint of the director of agriculture to a court of competent jurisdiction in the county in which the commercial feed is located. The court, *upon a finding that the commercial feed is in violation of sections 923.41 to 923.55 of the Revised Code or any rule adopted under those sections*, shall order the condemnation of the commercial feed and it shall be disposed of in a manner consistent with the quality of the feed and the laws of this state. *The court shall not order the condemnation of the commercial feed without first giving the manufacturer or distributor an opportunity to reprocess or relabel the feed to bring it into compliance with sections 923.41 to 923.55 of the Revised Code and the rules adopted under those sections."* (Emphasis added).

{¶19} Further, O.A.C. 901.5-7-20(B) is entitled "Ingredients for pet

foods" and provides, in pertinent part, as follows:

"(B)   * * * Any ingredient for which the association of American feed control officials has established a name and definition shall be identified by the name so established. Any ingredient for which no name and definition has been so established shall be identified by the common or usual name of the ingredient. Brand or trade names shall not be used in the ingredient statement."

Read together, these sections provide that the ODA may issue a stop sale

order, without a prior hearing.  The manufacturer or distributor is then given

Washington App. No. 10CA17                                                    12

thirty days to bring the feed into compliance. After that time has passed

ODA has the option of instituting a condemnation proceeding, as does the

manufacturer or distributor. Based upon a plain reading of the statute, such

a proceeding would have determined whether the feed was in violation of

sections 923.41 to 923.55 of the Revised Code. Further, a manufacturer or

distributor must be given an opportunity to reprocess or relabel the feed to

bring it into compliance before a court can order condemnation. Thus, a

manufacturer is given two chances to come into compliance during this

procedure.

{¶20} Appellant contends that R.C. 923.52 specifically provides for a

judicial review of a stop-sale order in the form of a condemnation

proceeding, but that Appellees failed to request such a hearing. Appellant

argues that had Appellees requested a condemnation hearing, it would have

"brought the entire issue of correctness of the stop sale orders before a fair

tribunal in a prompt fashion." Appellant also argues that the trial court

confused the issues of whether Appellant allegedly interpreted a feed rule

correctly with whether it applied the statute in violation of Appellees'

constitutional rights to due process and equal protection.

{¶21} Appellees' position is that they have a property interest in

making a living and that they were not afforded due process and were denied

equal protection of the laws when Appellant, ODA, relied on R.C. 923.52 and O.A.C. 901.5-7-20(B) to stop them from manufacturing pet food that contained raw milk as an ingredient.  Appellees specifically contend that those particular code sections do not prevent them from using raw milk as an ingredient in a pet food product, and, as such, Appellant's basis for issuing the stop orders were illegal, and an unconstitutional application of the pertinent statutes.

{¶22} An individual may challenge a statute as being unconstitutional on its face and/or unconstitutional as applied to a particular set of facts. *Ruble v. Ream*, Washington App. No. 03CA14, 2003-Ohio-5969, at ¶ 17, citing *Belden v. Union Cent. Life Ins. Co.* (1944), 143 Ohio St. 329, 55 N.E.2d 629, at paragraph four of the syllabus. "If a statute is unconstitutional as applied, the State may continue to enforce the statute in different circumstances where it is not unconstitutional, but if a statute is unconstitutional on its face, the State may not enforce the statute under any circumstances." *Ruble* at ¶ 17; citing *Women's Med. Professional Corp. v. Voinovich* (C.A.6, 1997), 130 F.3d 187, 193. (Emphasis added).

{¶23} "A statute may be unconstitutional as applied if the government selectively enforces it in violation of equal protection rights."  *State v. Sturbois*, Athens App. No. 09CA12-13, 2010-Ohio-2492 at ¶ 23.  In *Yick Wo*

*v. Hopkins* (1886), 118 U.S. 356, 373-374, 6 S .Ct. 1064, the Supreme Court explained: "[t]hough the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution." *Sturbois* at ¶ 23.

{¶24} The Fourteenth Amendment to the United States Constitution provides that a state shall not deny any person the equal protection of the law. In other words, a state may not treat people differently under its laws on an arbitrary basis. *Harper v. Virginia State Bd. of Elections* (1966), 383 U.S. 663, 86 S.Ct. 1079. Unless a suspect class or a fundamental right is involved, a legislative distinction must bear a rational relationship to a legitimate state interest to comply with the Equal Protection Clause. *Clements v. Fashing* (1982), 457 U.S. 957, 963, 102 S.Ct. 2836. State laws must be applicable to all persons under like circumstances and not subject people to an arbitrary exercise of power. *Conley v. Shearer* (1992), 64 Ohio St.3d 284, 288, 1992-Ohio-133, 595 N.E.2d 862. The equal protection guarantee of Section 2, Article I, of the Ohio Constitution essentially is identical to that afforded by the Equal Protection Clause of the Fourteenth

Amendment. *Kinney v. Kaiser Aluminum & Chem. Corp.* (1975), 41 Ohio St.2d 120, 123, 322 N.E.2d 880.

{¶25} Although the trial court found that R.C. 923.52 was constitutional on its face it determined that ODA's interpretation of the ordinance, and its subsequent application of that interpretation, or stated another way, policy of selective enforcement, rose to the level of an equal protection violation. As will be discussed more fully in our analysis of Appellant's fourth assignment of error related to illegal rulemaking, we agree with trial court's determination that Appellant mistakenly interpreted the relevant statutes and rules to prohibit raw milk as a feed ingredient. However, for the following reasons, we cannot conclude that Appellant's stop sale order, issued in accordance with the process set forth in R.C. 923.52, deprived Appellant's of their rights to due process and equal protection of the laws.

{¶26} As properly argued by Appellant, Appellees did not request a condemnation hearing. Thus, they did not avail themselves of the administrative remedies available to them to promptly determine whether the basis of the stop sale orders were appropriate. Appellees contend that the stop sale orders were illegally issued because they had no "lots" of commercial feed on hand at the time of their issuance. We find this fact to

be irrelevant as both manufacturers had been actively engaged in the manufacture and distribution of the pet food at issue at the time the stop sale orders were implemented. Thus, we find the fact that they had no feed on hand on the day the orders were issued to be inconsequential.

{¶27} Appellees contended at trial that the underlying basis for the stop sale order, that the pet food contained raw milk which was an allegedly prohibited ingredient, was based upon an erroneous interpretation of the rules by ODA. As indicated above, we agree with Appellees' argument that the underlying basis for the issuance of the order was flawed. However, in our view, ODA's attempt to enforce an unwritten, or de facto, prohibition of raw milk does not rise to the level of creating a deprivation of due process or equal protection, especially considering Appellees did not request a condemnation hearing.

{¶28} In reaching its decision on the merits below, the trial court made several findings related to the issuance of the stop sale order and Appellee's lack of options to challenge the order. For instance, the trial court concluded 1) the manner in which the stop order was issued prevented Appellees from challenging the basis of the stop order; 2) because Appellees complied with the stop order, there was no mechanism by which they could have appealed the stop order; and 3) the only means by which Appellees

could have challenged the stop orders without willfully violating the orders, was by initiating a declaratory judgment action. Based upon the following, we disagree with the legal conclusions reached by the trial court.

{¶29} The stop sale order was issued in accordance with the process set forth in R.C. 923.52, a statute which the trial court found to be valid on its face and which none of the parties challenge on appeal. Appellees did not avail themselves of the due process protections in place, in the form a condemnation proceeding. Had they done so, they could have promptly argued their differing interpretation of the feed ingredient definitions. Conceivably, the parties' differing interpretations of the feed ingredient definitions pertaining to raw milk could have been resolved had such a hearing been held, Appellees could have been brought into compliance, and the stop order could have been lifted. However, Appellant did not initiate and Appellees did not request proceedings for condemnation. Thus, Appellees were not deprived of their right to a hearing, they simply did not exercise that right.

{¶30} Further, Appellees have not demonstrated that they are part of any suspect class, that they were subjected to an arbitrary exercise of power, or that they were treated differently than other persons under like circumstances. In fact, the testimony offered at trial suggests that Appellees

may be the only pet food manufacturers in the state of Ohio that use raw milk as an ingredient in their pet food products. As a result, we cannot conclude that Appellees were deprived of their constitutional rights to due process or equal protection by the issuance of the stop sale orders. As such, Appellant's first assignment of error is well taken. Accordingly, the decision of the trial court, to the extent that it determined that R.C. 923.52 was unconstitutionally applied to Appellees, resulting in a deprivation of due process and equal protection, is reversed.

## ASSIGNMENT OF ERROR IV

{¶31} In its fourth assignment of error, Appellant contends that the trial court erred and abused its discretion in holding that Appellant engaged in illegal rulemaking. Appellant essentially contends that the trial court improperly equated disagreement with Appellant's interpretation and enforcement of the pertinent rules with illegal rulemaking. Appellant further argues that just because a court may ultimately determine that an agency is incorrect in a given interpretation, it does not mean that the agency engaged in illegal rulemaking.

{¶32} Appellees allege that Appellant "engaged in illegal rulemaking by interpreting O.A.C. 901.5-7-20(B) in such a manner that it included a prohibition on the use of raw milk as an ingredient in a pet food product that

does not exist in the rule." The trial court agreed with this argument, ultimately concluding that Appellant had engaged in illegal rulemaking. For the following reasons, we agree with the trial court's conclusion.

{¶33} As set forth above, the interpretation of a statute involves a purely legal question. Thus, we conduct a de novo review of a trial court's judgment interpreting a statute and afford no deference to the trial court's interpretation of a statute. See, e.g., *Oliver v. Johnson*, Jackson App. No. 06CA16, 2007-Ohio-5880 at ¶ 5.

{¶34} In construing a statute, a court's paramount concern is the legislature's intent in enacting it. See, e.g., *State ex rel. Cincinnati Enquirer v. Jones-Kelley*, 118 Ohio St.3d 81, 2008-Ohio-1770, 886 N.E.2d 206, at ¶ 17; *State ex rel. Russell v. Thornton*, 111 Ohio St.3d 409, 2006-Ohio-5858, 856 N.E.2d 966, ¶ 11. " 'The court must look to the statute itself to determine legislative intent, and if such intent is clearly expressed therein, the statute may not be restricted, constricted, qualified, narrowed, enlarged or abridged; significance and effect should, if possible, be accorded to every word, phrase, sentence and part of an act * * *.' " *State ex rel. McGraw v. Gorman* (1985), 17 Ohio St.3d 147, 149, 478 N.E.2d 770, quoting *Wachendorf v. Shaver* (1948), 149 Ohio St. 231, 78 N.E.2d 370, paragraph five of the syllabus. To determine legislative intent, a court must " 'read

words and phrases in context and construe them in accordance with rules of grammar and common usage.' " Id., quoting *State ex rel. Russell v. Thornton*, supra, at ¶ 11. "In construing the terms of a particular statute, words must be given their usual, normal, and/or customary meanings." *Proctor v. Kardassilaris*, 115 Ohio St.3d 71, 2007-Ohio-4838, 873 N.E.2d 872, ¶ 12.

{¶35} When the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no need to apply rules of statutory construction. Id.; see also *Cline v. Ohio Bur. of Motor Vehicles* (1991), 61 Ohio St.3d 93, 96, 573 N.E.2d 77; *Sears v. Weimer* (1944), 143 Ohio St. 312, 55 N.E.2d 413, paragraph five of the syllabus. However, when a statute is subject to various interpretations, a court may invoke rules of statutory construction to arrive at legislative intent. R.C. 1.49; *Cline*, supra; *Carter v. Youngstown* (1946), 146 Ohio St. 203, 65 N.E.2d 63, paragraph one of the syllabus.

{¶36} Additionally, " 'An Ohio Administrative Code section is a further arm, extension, or explanation of statutory intent implementing a statute passed by the General Assembly.' " *Washington County Home v. Ohio Dept. of Health*, 178 Ohio App.3d 78, 2008-Ohio-4342, 896 N.E.2d 1011; quoting *Belinky v. Drake Center*, 117 Ohio App.3d 497, 505-506, 690

N.E.2d 1302. Thus, when reasonably possible, courts must harmonize, reconcile, and construe statutes and administrative regulations together. See *State ex rel. Cuyahoga Cty. Hosp. v. Ohio Bur. of Workers' Comp.* (1986), 27 Ohio St.3d 25, 27, 500 N.E.2d 1370, citing *State ex rel. McGraw v. Gorman* (1985), 17 Ohio St.3d 147, 478 N.E.2d 770, and *Wooster Republican Printing Co. v. Wooster* (1978), 56 Ohio St.2d 126, 383 N.E.2d 124. Moreover, a rule implemented as an extension of a statute has the full force and effect of a statute, unless it is unreasonable or conflicts with a statute covering the same subject matter. See *State ex rel. Celebrezze v. Natl. Lime & Stone Co.* (1994), 68 Ohio St.3d 377, 382, 627 N.E.2d 538; *Belinky*, supra, at 505.  R.C. 923.50, which is entitled "Rulemaking powers; adoption of definitions" provides, in pertinent part, as follows:

"(A)   The director of agriculture shall adopt, and may amend or rescind, rules in accordance with Chapter 119. of the Revised Code as necessary to carry out the purposes of this chapter.

(B)   The director, by reference, may adopt:

(1)   The official definitions of feed ingredients and official feed terms adopted and published by the association of American feed control officials;"

{¶37} O.A.C. 901:5-7-01, which is entitled "Definition and terms" provides, in pertinent part, as follows:

"(A)   Except for those terms specifically defined in this chapter, the department of agriculture hereby adopts, by reference, the following from the association of American feed control officials (AAFCO):

(1)    The official definitions of the feed ingredients, the official feed terms, and the process and procedures as contained in the 2005 edition of the Official Publication; and

(2)    The May 1, 2000, AAFCO feed inspectors manual." (prior version with eff. date 09-22-2005)

{¶38} Further, O.A.C. 901:5-7-20, entitled "Ingredients for pet foods," provides, in pertinent part, as follows:

"(B)   Each ingredient of the pet food shall be listed in the ingredient statement, and names of all ingredients in the ingredient statement must be shown in letters or type of the same size. The failure to list the ingredients of a pet food in descending order by their predominance by weight in non-quantitative terms may be misleading. *Any ingredient for which the association of American feed control officials has established a name and definition shall be identified by the name so established. Any ingredient for which no name and definition has been so established shall be identified by the common or usual name of the ingredient.* Brand or trade names shall not be used in the ingredient statement." (Emphasis added).

{¶39} Finally, R.C. 119.03, entitled "Procedure for adoption, amendment, or rescission of rules; fiscal analysis," in (A) and (B) provides that in adopting, amending or rescinding any rule, the agency shall file electronic copies of the proposed rule or changes with the secretary of state and with the director of the legislative service commission, thereby putting the public on notice, and a public hearing must be held.

{¶40} Thus, based upon a plain reading of the statutes, and in attempt to harmonize the statutes and the above rules, it appears that the legislature authorized the director of agriculture to adopt rules in accordance with R.C. 119.03, and also to adopt feed terms and feed ingredient definitions as set forth by the American Association of Feed Control Official's (AAFCO's) official publication. Further, it appears that the director exercised such authority by virtue of the existence of O.A.C. 901:5-7-01, which adopted and incorporated by reference the official definitions of the feed ingredients, the official feed terms, and the process and procedures as set forth in the AAFCO's Official Publication, 2005 Ed.

{¶41} The parties herein manufacture pet food containing raw milk and goat milk. Appellee Fagan's products contain raw cow's milk while Appellee Betts' products contain goat's milk. Appellant contends that raw milk is a prohibited pet food ingredient because it is not listed as an approved ingredient in the AAFCO's list of approved ingredients, and because it is not exempted from being listed as an ingredient in O.A.C. 901:5-7-01.[4] Appellees argue, to the contrary, that AAFCO does have a

---

[4] This version of the rule in effect at the time the stop sale ordered was issued exempted raw meat, hay, straw, stover, silage, cobs, husks and hulls from the definitions of commercial feed. Of importance herein, the current version of the rule, which became effective July 7, 2008, also exempts goat milk (as used by Appellee Betts in her pet food products).

definition for milk[5], and also argues in the alternative that even if AAFCO

did not have a definition for milk, milk is a common name that requires no

definition.  In support of their alternative argument, Appellees rely on the

following language contained in the introduction of the Feed Ingredients

Definition section of the 2005 Official Publication:

"Occasionally, an item may be suggested as an ingredient in a mixed feed
that is not listed in this publication.  When this happens, the appropriate
investigator should be contacted, a term developed, and the product defined.
*Some ingredients, e.g. sugar, are so common there is no need to define
them.*"  (Emphasis added).

{¶42} Appellees argue that the Ohio Revised Code, the Ohio

Administrative Code, and the AAFCO do not prohibit raw milk as an

ingredient in pet food.  Appellees further argue there have been no changes

in the statutes, rules or referenced definitions since Appellees were first

licensed to sell pet food containing raw milk, and that the only change has

been the director of the Ohio Department of Agriculture's Feed, Fertilizer

and Seed Section from William Goodman to David Simmons.  We agree

with Appellees that the Ohio Revised and Administrative Codes to do not

expressly prohibit milk or raw milk as a pet food ingredient.  Further, based

upon the testimony introduced at trial related to AAFCO's position on milk

as an ingredient, and in light of the fact that the Administrative Code

---

[5] The AAFCO's Official Publication, 2005 Ed., includes "raw" and "milk" as feed terms.  Raw is a term defined as "[f]ood in its natural or crude state not having been subjected to heat in the course of preparation as a food."  Milk is a term defined as "[t]otal lacteal secretion from the mammary gland."

indicates that the director of agriculture has adopted AAFCO's feed definitions and incorporated them by reference into the Code, we agree with Appellees' that raw milk is not a prohibited feed ingredient.

{¶43} For instance, at trial, William Goodman, former director of Feed, Fertilizer and Seed, and twenty-nine year ODA employee, testified as follows:

"Q.    And what's your understanding of why we're here today?

A.    My understanding is that the interpretation of the Ohio Feed Law is that raw milk or goat milk is not a pet food.

Q.    And is that a change in interpretation from when you used to be head of the section?

A.    Yes.

Q.    So ODA has changed their position then; is that correct?

A.    That's correct."

{¶44} Dennis Fravel, a grain, feed, and seed inspector with twenty years experience with ODA, also testified at trial as follows:

"Q.    This is the 2005 official publication, right?

A.    Yes.

Q.    On page 244, one of the feed terms that's listed is milk.[6]

A.    Milk, total lacteal secretion from the mammary glands.

---

[6] On cross examination, counsel for Appellant drew a distinction between milk being listed as a feed term versus as a feed ingredient.

Q.     From the mammary glands?

A.     Yes.

* * *

Q.     Mr. Fravel, this is is [sic] the regulation 5-7-20, Paragraph B.  Can you read the last two sentences of Paragraph B into the record, please?

A.     'Any ingredient for which the Association of American Feed Control Officials has established a name and definition shall be identified by the names so established.  Any ingredient for which no name and definition has been so established shall be identified by the common or usual name of the ingredient.'

Q.     Okay.  So here this regulation is referring to AAFCO, isn't it?

A.     Yes, sir.

Q.     And it says, basically, if a name has been identified, you shall name that name on the label, right?

A.     Yes, sir.

Q.     And we just read in the 2005 AAFCO handbook, milk is one of the names, right?

A.     It gives the definition of it, yes.

* * *

Q.     So as an employee of ODA, they're not in violation of 5-7-20 B, are they?

* * *

A.     It would be a common name.

Q.     Milk would be a common name.

A.    Yes."

{¶45} David Simmons, William Goodman's successor at ODA, also testified at trial. Although much of Simmons' testimony is pertinent, we do not include all of it due to the volume; however, Simmons essentially testified that he interpreted the Ohio rules and statutes, as well as the AAFCO definitions to prohibit the use of milk or raw milk as an ingredient in pet food. The following excerpt highlights the gist of Simmons' position with regard to raw milk:

"Q.    Where does it say in the law, in the Ohio Administrative Code or in the Ohio Revised Code, that you can't use milk?

A.    The Ohio Revised Code adopts AAFCO's official feed definitions. Milk is not in the feed definitions as an approved ingredient. It is not in GRAS – it's not recognized as safe under GRAS by CVM. It is not exempted in our law as a whole commodity. And so it's left for that one area if raw milk is determined to be common – so common that it does not need defined.

Q.    Where does the Ohio Administrative Code refer to GRAS? Which is G-R-A-S, Generally Recognized as Safe, correct?

A.    Correct, yes.

Q.    Where does the Ohio Administrative Code or Ohio Revised Code refer to GRAS:

A.    AAFCO, within the feed terms.

* * *

A.    AAFCO adopts GRAS terms in the back of the book.

Q.     It does?  You've got the 2005 edition, right?

A.     Yeah.

Q.     Where is milk excluded or prohibited?

A.     It's not approved.

Q.     It's not approved?  By who?

A.     It's not approved by AAFCO.  It's not approved by CVM.

Q.     Well, then your testimony is different than Dr. Rodney Noel's, isn't it?

A.     If you say so."

{¶46} Dr. Rodney Noel, former president and current secretary treasurer of AAFCO and member of the pet food committee, was deposed in this matter and his deposition was introduced at trial.  In his deposition, Mr. Noel testified as follows:

"Q.     * * * So what about milk, is milk a feed term?

A.     I don't think so.

Q.     You don't think so?

A.     I, let me make sure.  Yes it is.

Q.     Okay, something other than just milk would have to be the ingredient.

A.     Yes.

Q.     Like whole milk, skim milk, fat something like that.

A.      Right.

Q.      Okay, well, let me cut to the chase then, in terms of AFFCO's [sic] position, does AFFCO [sic] take a position on whether or not raw milk can be used as an ingredient in a pet food?

A.      We haven't at this time, no.

* * *

Q.      Okay.  And has AFFCO [sic] established the name and definition for milk?

A.      Just the feed term.

Q.      Okay, the feed term, okay.

A.      Right.

Q.      Would you consider milk a common name or usual name?

A.      Yes.

* * *

Q.      Okay.  If milk's not adulterated, or if there's no evidence that is [sic] adulterated, would there be any AFFCO [sic] prohibition against using that raw milk as a pet food ingredient?

A.      Not at this time."

{¶47} Thus, based upon our review of the relevant statutes and administrative rules, and in light of the foregoing testimony, we conclude that raw milk is not a prohibited pet food ingredient.  We further conclude that by prohibiting raw milk as an ingredient in pet food and enforcing that prohibition through the use of stop sale order, Appellant, ODA, has engaged

in illegal rulemaking in violation of R.C. 119.  Appellant correctly points out that it must follow a specific procedure in adopting administrative rules, but argues that it has merely interpreted the rules in such a way that prohibits raw milk.  We conclude, however, the fact that there is no formal, written or adopted rule prohibiting raw milk to be the essence of the problem.  ODA is, in effect, establishing and enforcing a de facto rule, or agency policy, that has affected Appellees' private rights, has no basis in the law and which the public, and specifically, Appellees were not provided notice.

{¶48} As argued by Appellees and as set forth above, R.C. 119.03 sets forth certain procedures that must be followed when adopting rules.  None of these procedures were followed with regard to ODA's unwritten policy of prohibiting raw milk as a pet food ingredient.  There was nowhere Appellees could have looked which would have put them on notice of this policy.  The fact that ODA had previously approved Appellees' products and labels, which specifically disclosed the allegedly prohibited ingredients, further illustrates the fact that Appellees, and the general public were not put on notice of this agency policy, which in effect, was enforced as if it were a properly promulgated rule.

{¶49} Our reasoning is further supported by the Supreme Court of Ohio's decision in *State ex rel. Celebrezze v. National Lime & Stone Co.*,

supra, which involved the interpretation of certain administrative rules promulgated by the Director of the Ohio Environmental Protection Agency. Although the Court noted "the long accepted principle that considerable deference should be accorded to an agency's interpretation of the rules the agency is required to administer[,]" the Court determined that the interpretation of the Attorney General was unreasonable. Id. at 382. After reaching this conclusion, the Court reasoned that "to allow appellee to broadly interpret a rule that the OEPA has tacitly admitted is less than all-inclusive would be tantamount to unannounced rulemaking in violation of R.C. Chapter 119." Id. at 383. In further discussion, the Court stated as follows: "Excessive regulation can disrupt vital functions of a business, threatening the company's very existence. Similarly, exposing a business to regulations not explicitly covered by statute or rule could have an equally detrimental impact." Id at 384.

{¶50} Here, we find Appellant's unreasonable interpretation of the relevant rules, statutes and definitions, and subsequent enforcement was tantamount to illegal rulemaking in violation of R.C. Chapter 119. As such, Appellant's fourth assignment of error is overruled and decision of the trial court is affirmed with respect to this issue.

ASSIGNMENT OF ERROR III

{¶51} In its third assignment of error, Appellant contends that the trial court erred and abused its discretion in issuing an injunction against future enforcement by Appellant of Ohio's feed label laws against Appellees' feed product labels. The standard of review regarding the granting of an injunction by a trial court is whether the trial court abused its discretion. *City of Canton v. Campbell*, Stark App. No. 2001CA00205, 2002-Ohio-1856 citing *Mechanical Contractors Association of Cincinnati, Inc. v. University of Cincinnati* (2001), 141 Ohio App.3d 333, 338, 750 N.E.2d 1217. The terms abuse of discretion connotes more than an error of law or judgment. It suggests that the court's attitude is unreasonable, arbitrary or unconscionable. Id .

{¶52} Appellant initially contends that Appellees' should not have been able to pursue an injunction, arguing there was no claim for injunctive relief to be found anywhere in the amended complaint. To the contrary, Appellant's amended complaint was titled "Amended Complaint for Declaratory Judgment and Injunctive And Other Relief." Further, in the "Prayer for Relief" Appellees' requested that the trial court "[d]eclare that ODA is estopped from revoking Linda's and Donna's commercial feed registrations now and in the future."

{¶53} Civ.R. 8 governs "General rules of pleading" and provides in

(A) "Claims for relief" that

"A pleading that sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the claim showing that the party is entitled to relief, and (2) a demand for judgment for the relief to which the party claims to be entitled."

In *Ogle v. Ohio Power Co.*, 180 Ohio App.3d 44, 2008-Ohio-7042, 903 N.E.2d 1284 at ¶ 5, we noted that "Civ.R. 8(A) requires only a short and plain statement of the claim that gives the defendant fair notice of the plaintiff's claim and the grounds upon which it is based[,] * * * Thus, a plaintiff is not required to plead the legal theory of the case at the pleading stage and need only give reasonable notice of the claim." Citations omitted. As such, we cannot conclude that that trial court erred or abused its discretion in considering Appellees' request for an injunction.

{¶54} Appellant further contends that "the injunction as stated goes far beyond any reasonable or necessary remedial measure[,]" arguing that the trial court has essentially granted Appellees "a lifetime 'immunity card' from the requirements of lawful public protection law." In support of this argument Appellant points out that aside from the issue of whether milk is an acceptable ingredient, the labels do not contain other mandatory terms related to a guaranteed analysis, disclosures of crude protein, fat, fiber and

moisture, disclosure of the intended animal species and adequate feeding instructions. The trial court summarily dismissed this argument below, reasoning that "ODA cannot now use other reasons for issuing the stop orders to the Plaintiffs, including such reasons as their labels do not contain instructions for use, they do not specify the species of animal for which the products should be used, or they do not contain moisture content or minimum or maximum percentages."

{¶55} Contrary to the findings of the trial court, Appellant made this argument as early as the summary judgment phase, well before the trial on the merits. As set forth above, David Simmons affidavit in support of Appellant's motion for summary judgment alleged these labeling deficiencies and Appellees have not disputed them. Thus, we agree with Appellant's argument that the injunction granted goes beyond any necessary remedial measure. To affirm the injunction as it is would permit Appellees' noncompliance with these other labeling requirements.

{¶56} However, in light of our determination under Appellant's fourth assignment of error that Appellant engaged in illegal rulemaking by enforcing a prohibition against raw milk, we uphold the injunction to the limited extent that it enjoins Appellant from issuing stop sale orders or revoking Appellees feed registrations based upon the inclusion of raw milk

as an ingredient.  That is, unless and until Appellant, ODA, properly promulgates a rule which specifically prohibits the use of raw milk.

{¶57} As such, we conclude that the trial court abused its discretion in granting injunctive relief, to the extent that the relief exceeds enjoining Appellant from enforcing a prohibition on raw milk.  Accordingly, Appellant's third assignment of error is sustained in part and the injunction is vacated in part.

## ASSIGNMENT OF ERROR II

{¶58} In its second assignment of error, Appellant contends that the trial court erred and abused its discretion in awarding Appellees attorney fees.  Specifically, Appellant argues that the trial court awarded all of Appellees attorney fees from the beginning of their dealings with ODA without regard to whether such fees pertain to the legal issues upon which they prevailed.  Appellants argue that some of the legal fees pertain to the dismissed counts relating to the ODA administrative matter.  Appellant also argues that it was substantially justified in initiating the matter in controversy and as such attorney fees should have been denied.  Appellant further challenges the trial court's decision to allow an hourly rate of $165.00, instead of the statutory rate of $75.00 per hour.

{¶59} We initially note that the trial court appears to have granted attorney fees under R.C. 2335.39 rather than R.C. 119.092 as Appellees did not go through the administrative hearing process. In reviewing the action of the court of common pleas, we may modify the court's order only if we find that the grant of an award, or the calculation of the amount of the award, involved an abuse of discretion. R.C. 2335.39. The terms abuse of discretion connotes more than an error of law or judgment. It suggests that the court's attitude is unreasonable, arbitrary or unconscionable. *Mechanical Contractors Association of Cincinnati, Inc,* supra.

{¶60} R.C. 2335.39(B) provides that an individual may recover attorney fees if (1) he prevails, (2) he is financially eligible, and (3) the state's position in initiating the matter in controversy was not substantially justified. Further, when considering a motion for attorney fees, a trial court may deny an award or reduce it if it finds that the state was substantially justified in initiating the matter in controversy, or that the "prevailing eligible party engaged in conduct during the course of the action or appeal that unduly and unreasonably protracted the final resolution of the matter in controversy." R.C. 2335.39(B)(2)(a)-(b).

{¶61} We first address the issue of whether Appellees were, in fact, prevailing parties under R.C. 2335.39.[7] The trial court found Appellees to be prevailing parties and awarded them all of their attorney fees, without reduction, at an hourly rate of $165.00. Appellant challenges this finding, arguing Appellees cannot be prevailing parties on counts two and three of their complaint, which were voluntarily dismissed.

{¶62} R.C. 2335.39(A)(5) defines a "prevailing eligible party" as "an eligible party that prevails in an action or appeal involving the state." Here, Appellees' amended complaint included four counts and a request for an injunction. Counts one and four dealt with the issuance of the stop sale order under R.C. 923.52 and ODA's illegal rulemaking, respectively and were the subject of the present appeal. Counts two and three both dealt with ODA's failure to hold an administrative hearing after proposing to revoke Appellees' commercial feed registrations. Counts two and three were voluntarily dismissed by Appellees at the trial court level and have not been addressed on appeal.

{¶63} "A party who appeals an order or judgment and prevails to the extent that he obtains a new trial, or a modification of the judgment, is a "prevailing party" within the contemplation of R.C. 2335.39. There is

---

[7] It is undisputed on appeal that Appellees are financially eligible parties, thus, we do not address this issue.

nothing in that section that requires a finding that a prevailing party on an appeal is limited to one who succeeds in having a 'complete victory,' which presumably means having the entire matter determined in his favor without a remand to the tribunal from which the appeal is taken for further proceedings." *Korn v. Ohio State Medical Board*, 71 Ohio App.3d 483, 487, 594 N.E.2d 720. Although Korn prevailed in his appeal, he failed to achieve a total victory. Id. In response to an argument that attorney fees could not be awarded on a pro rata basis, the Tenth District Court of Appeals reasoned that "the trial court must find the amount of attorney fees that were reasonably expended with respect to the matters as to which Korn was successful on appeal." Id. at 489.

{¶64} We find the reasoning in *Korn* to be persuasive and instructive on how to handle the issue presently before us. Thus, like the trial court, we find Appellees to be prevailing parties, despite their failure to achieve a complete victory. However, we also find that the trial court should have apportioned the award of attorney fees based upon the counts upon which Appellees were successful and that its failure to do so was an abuse of discretion. Thus, and in light of the determinations made in the within appeal, Appellees were only successful on count four of their amended complaint, as well as their request for an injunction. In so finding, we agree

with Appellant that Appellees should not be awarded attorney fees for counts two and three, which they voluntarily dismissed at the trial court level.

{¶65} We next address the issue of whether the trial court should have denied or reduced the attorney fee award under R.C. 2335.39(B)(2)(a) or (b). Here, in light of the fact that we determined Appellant engaged in illegal rulemaking and initially issued a stop sale order pursuant to its illegal rulemaking, we reject Appellant's assertion that it was substantially justified in initiating the matter in controversy.[8] As such, the trial court did not abuse its discretion in failing to deny or reduce the award under R.C. 2335.39(B)(2)(a). However, in light of our determination that Appellees should have requested a condemnation hearing pursuant to R.C. 923.52, on remand, the trial court would be justified in reducing the award accordingly.

{¶66} Finally, Appellant challenges the trial court's determination that an hourly rate of $165.00 was reasonable. R.C. 2335.39(A)(3) provides that " '[f]ees' means reasonable attorney's fees, in an amount not to exceed seventy-five dollars per hour *or a higher hourly fee approved by the court.*" (Emphasis added). At the hearing on attorney fees, counsel for Appellees testified that his usual hourly rate is $175.00 per hour but that he billed

[8] We agree with Appellees that ODA's issuance of the stop sale order initiated the matter in controversy. *State ex rel. R.T.G. Inc., et al. v. State of Ohio*, 98 Ohio St.3d 1, 2002-Ohio-6717, 780-N.E.2d 998 at ¶67.

Appellees $165.00.  The trial court found this hourly rate to be acceptable and in light of the language in the statute, we cannot find that the trial court abused its discretion in approving that hourly rate.

{¶67} Accordingly, based upon our conclusion that the trial court abused its discretion in awarding attorney fees, Appellant's second assignment of error is sustained.  The issue of attorney fees is remanded to the trial court for reduction of the fees on a pro rata basis, taking into consideration the issues upon which Appellees were successful, bearing in mind the result of the current appeal.  Further, on remand, the trial court should consider whether and to what extent Appellees failure to request a condemnation hearing unduly and unreasonably protracted the final resolution of the matter in controversy, and shall reduce the amount of attorney fees accordingly.

**JUDGMENT AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.**

# **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND THE CAUSE REMANDED  and that the Appellees and the Appellant split the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Exceptions.

Abele, J.: Concurs in Judgment and Opinion.
Harsha, P.J.: Concurs in Judgment Only.

For the Court,

BY:  _____
Matthew W. McFarland, Judge

## **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**